**UNITED STATES, Appellee,**

v.

**Alexander LOPEZ, Defendant, Appellant.**

**No. 92-2010.**

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1993.

Decided March 25, 1993.

William T. Murphy, Providence, RI, was on brief, for defendant, appellant.

Zechariah Chafee, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, RI, was on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

In the district court, Alexander Lopez was convicted of possessing cocaine with intent to distribute and with conspiracy to commit the same offense. 21 U.S.C. §§ 841(a)(1), 846. The jury deadlocked on two other counts, later dismissed, charging Lopez with possessing a short barrel shotgun and with its use in drug dealing. 26 U.S.C. § 5861(d); 18 U.S.C. § 924(c)(1). On this appeal, Lopez contests only the district court's refusal to suppress evidence obtained at the time of his arrest. We affirm.

The pertinent facts, developed mainly at the suppression hearing, can be briefly stated. Early on the morning of June 22, 1991, Charles Perry, a long-time cocaine user, went to a building in Providence, Rhode Island, to purchase cocaine. The building was a decrepit three-story tenement and, on the second floor, there was a kitchen, an adjoining bathroom, and three adjoining bedrooms available for rent on a weekly basis to tenants, who were expected to share the kitchen and bathroom. On the morning of June 22, one bedroom, previously used by prostitutes, was empty; one was occupied by a respectable tenant away at work; and the last was used by a cocaine dealer named Blackie for whom Lopez worked.

Arriving at the second floor by the back stairs, Perry found the door to the kitchen open and entered to find Lopez and another man. Perry bought a small bag of cocaine from Lopez and left to inject the cocaine. Several hours later, Perry returned. Finding the second floor door now closed, he negotiated a sale from the outside, took his purchase downstairs and found that he had bought baking soda. Returning to the second floor, he pounded on the door and yelled until admitted. There he found Lopez, the unidentified man present on his first visit, and Blackie. When Perry began to yell, Blackie leveled a sawed-off double-barrel shotgun at Perry and told him to leave.

Retreating to the yard outside, Perry continued to yell. Blackie left, threatening Perry as he did so. Perry then had someone call the police to report that Perry had been threatened with a sawed-off shotgun. Lopez emerged and gave Perry a packet of cocaine. Police cars, responding to a radio alert, began to arrive. Pointing to the building, Perry then described to several officers a male wearing green camouflage trousers and no shirt. Officer Tombs, who arrived separately, heard the description and saw Lopez standing in the yard behind the building, without a shirt and wearing green camouflage pants, apparently holding an object.

Tombs, clad in uniform, called on Lopez to halt. Instead, Lopez dashed into the building and ran to the second floor. Tombs pursued, broke through two intervening doors, and arrested Lopez in the little bedroom. As Tombs handcuffed Lopez, a radio fell over, and six tiny baggies of cocaine were disclosed. Other officers appeared, including Officer Vanderhorst, and a search for the shotgun ensued. Vanderhorst, entering the bathroom, saw a ceiling tile missing. He stood on the toilet, peered in, and saw a big bag, which proved to have smaller bags of cocaine inside. Then, looking in again, he saw a gun butt. As he climbed down, possibly using a ceiling panel as a hand-hold, the ceiling collapsed and spilled a sawed-off shotgun onto the floor. From handcuffing to discovery of the gun, only a few minutes passed.

After a suppression hearing before trial, the district court refused to suppress the shotgun or the cocaine found in the bedroom and the bathroom. The court found that the arrest leading to the discovery of cocaine in the bedroom was based upon probable cause and that Lopez had no standing to object to the search of the bathroom. On the issue of standing, the court found that the bathroom was available to anyone on the premises, had no outside lock, and engendered no expectation of privacy. The cocaine and shotgun were offered as evidence at trial. Lopez was convicted on the cocaine counts.

On this appeal, Lopez argues that as an authorized user of the apartment, he had standing to object to the bathroom search under *United States v. Irizarry*, 673 F.2d 554 (1st Cir.1982). In turn, the government defends the district court's suppression ruling primarily by arguing lack of standing, citing *United States v. Thornley*, 707 F.2d 622 (1st Cir.1983). As a second string to its bow, the government argues that exigent circumstances justified the search for the shotgun without awaiting a warrant. We think the standing issue a close call and prefer to affirm on the merits of the Fourth Amendment claim.

■ It is common ground that the Fourth Amendment forbids only unreasonable searches and seizures; that normally a search is unreasonable absent a warrant issued by a neutral magistrate upon a showing of probable cause; and that to excuse the lack of a warrant, the police must ordinarily bring the case within one or more of a list of exceptions to the warrant requirement. *See generally Coolidge v. New Hampshire*, 403 U.S. 443, 477–78, 91 S.Ct. 2022, 2043–44, 29 L.Ed.2d 564 (1971). A few of the exceptions are huge, such as arrest for felony and search incident to arrest, which embrace Lopez' arrest in the bedroom—assuming probable cause to pursue him in the first place. Most of the exceptions, however, are narrower and more complex.

■ The exception with which we are concerned in this case excuses the lack of a warrant where "exigent circumstances" exist, requiring speed and making delay improvident. Although the most frequent example is the threatened destruction of evidence, *e.g., Cupp v. Murphy*, 412 U.S. 291, 294–96, 93 S.Ct. 2000, 2003–04, 36 L.Ed.2d 900 (1973), a solid line of cases finds exigent circumstances where the safety of law enforcement officers or the general public is threatened. *E.g., Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *Criminal Proce-*

*dure Project*, 80 Geo.L.J. 939, 987 (1992) (collecting numerous cases). This circuit has so held. *E.g., United States v. Rengifo*, 858 F.2d 800, 805 (1st Cir.1988), *cert. denied*, 490 U.S. 1023, 109 S.Ct. 1752, 104 L.Ed.2d 189 (1989).

The question here, then, is whether the police had a reasonable basis to believe that a threat to safety existed of an urgency and magnitude that would justify a warrantless search of the kind that occurred. In truth, two different issues are embraced in this formula. One is the police perception of danger, judged by what the officers saw and knew at the time. The other, a legal issue for the courts, is whether under the Fourth Amendment the perceived threat justified their behavior. In this case, what the officers saw and knew is largely apparent from the record. By a close margin, we think their perception justified their conduct.

The most important element is that the police had reason to believe that Lopez had a sawed-off shotgun nearby, which had been used only shortly before to threaten Perry. That Blackie had done the threatening, not Lopez, was apparently unknown to the officers; if they had known, it could only have increased their concern since Blackie was still at large. Thus, the police had ample basis for believing that an extremely dangerous weapon was lodged close at hand and should be recovered as promptly as possible.

It is hard to think that Lopez himself posed an immediate danger. Although one in custody may yet present risks, it appears that Lopez was handcuffed in the bedroom and that other officers were there when the bathroom search occurred. Still, the police had no assurance that Lopez was acting alone (in fact, he was not), or that the apartment was secure (there were actually two entrances on the second floor). Officer Tombs thought that others might have been with Lopez in the second floor apartment.[1] The nature of the building—a

---

1. Tombs testified at the suppression hearing that when he reached the second floor in pursuit of Lopez, he heard within: "Footsteps, fast moving footsteps. I couldn't determine how

many people, how many, you know, subjects were in the house. But there was footsteps running about the house, inside the door."

dilapidated, multi-tenant structure—lent further weight to a reasonable concern that the shotgun might be hidden nearby, recovered by others, and used again.

The nature of the search is also important. This is not because Lopez lacked "standing" as to the bathroom area (we assume *arguendo* that he had standing), but because the degree of intrusion has a bearing on the reasonableness of the police action. It is one thing to break into and search a family home, another to frisk an arrested suspect, another to search a car, and yet another to make a protective sweep of an already entered building to uncover other suspects. In each such case, the extent of the intrusion, and the proportionality of response to need, inform the constitutional judgment.

Here, the intrusion, although not minimal, was limited: the officer saw the opening in the bathroom ceiling through an open door, entered the empty room, and with little effort saw the butt of the weapon. There was no new entry into a private residence; the police were lawfully in the kitchen. And the search can be justified as one not merely for evidence or even contraband but for a dangerous weapon in a building where others might gain access to it. If the weapon were not swiftly recovered, a search for others outside the building might be needed. Thus, this was a proportionate search, limited in its range, specific in its object, and justified by exigent circumstances.

There is considerable case law on exigent circumstances but, as one might expect in this area, the cases are heavily dependant on the facts. The closest case in this circuit appears to be *Irizarry*, upholding a warrantless search of a hotel room to the extent needed to assure that a suspected armed "fourth person" did not remain within. 673 F.2d at 558. *Irizarry*, in which the fourth person was reasonably believed to be hiding in the room, is a stronger case for a warrantless search, but other circuits on facts closer in strength to our own have found them strong enough. *E.g., United*

States v. Queen, 847 F.2d 346, 353 (7th Cir.1988); *United States v. McKinney*, 477 F.2d 1184, 1186 (D.C.Cir.1973).[2] We agree, cautioning that our own facts may press close to the outer limit of the Fourth Amendment.

■ Lopez' other challenge is to the lawfulness of the original pursuit, and this claim can be answered more swiftly. If the original entry was unlawful, the seizure of the cocaine in the bedroom might be suppressed as the fruit of the poisonous tree, *see generally Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 414, 9 L.Ed.2d 441 (1963), and the ban might extend as well (we need not decide the point) to the evidence found in the bathroom and a volunteered statement at the police station. Lopez says that the original pursuit was unlawful because the attempted, and ultimately successful, seizure of Lopez was not based on probable cause to believe that he had committed a crime.

On the contrary, the police had a reasonable basis to believe that Lopez was the man who had leveled a shotgun at Perry, even though in the event it turned out to be Blackie who had held the weapon. Officer Tombs, arriving to investigate the crime, heard Perry describe an Hispanic male, shirtless and in camouflage pants, and saw a man fitting this description standing near the building to which Perry had pointed. When Tombs in uniform called on Lopez to halt, Lopez instead fled. These circumstances including flight gave Tombs reason to believe that Lopez was the culprit, *United States v. Vasquez*, 534 F.2d 1142, 145 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976), and the belief in turn justified entry under the "hot pursuit" doctrine, *see generally United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300 (1976), and ultimately arrest.

In sum, the shotgun and cocaine evidence was permissibly seized and introduced at trial, and the conviction is therefore valid.

---

**2.** *McKinney,* peculiarly on point, sustained the warrantless search of a hotel room—while the occupant was out—after a bellman observed a sawed-off shotgun on the table.

Accordingly, the judgment of the district court is *affirmed.*