# United States Court of Appeals
## For the First Circuit

No. 18-1391

UNITED STATES,

Appellee,

v.

GABRIEL RODRÍGUEZ-PACHECO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Lauren E.S. Rosen, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, Vivianne M. Marrero, Assistant Federal Public Defender, Supervisor, Appeals Section, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, were on brief, for appellant.
Francisco A. Besosa-Martínez, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

January 15, 2020

**THOMPSON**, <u>**Circuit Judge**</u>.  Let's start our work with the big picture:  Gabriel Rodríguez-Pacheco ("Rodríguez") was a police officer for the Puerto Rico Police Department who was accused of domestic violence, and when some fellow officers showed up at his mother's house (where he was living) in connection with that accusation, a warrantless entry into the house and seizure of Rodríguez's cellphone, camera, and laptop ensued.  A later search of the laptop revealed incriminating evidence of the domestic abuse charge, as well as images of unrelated criminal conduct that form the basis for the charges against him in the case now before us.  In the lead-up to his trial, Rodríguez moved to suppress the electronics and the information gleaned from them, along with statements he made to the police.  The lower court granted the motion as to some statements Rodríguez made, but denied it as to others.  Important here, the lower court denied Rodríguez's motion to suppress seized evidence.  Rodríguez appealed, and that's where we come in.

But before we embark upon our analysis, we provide an up-front spoiler to explain why we forgo both a lengthy beginning-to-end rundown of the facts (arrest, search, and seizure) and a comprehensive recap of the lower court's reasoning, ultimately leap-frogging some of the arguments before us and not even reaching others.  We do this because, for reasons we'll explain, we agree with Rodríguez on a threshold (literally) issue:  the officers'

warrantless entry into the house, on the grounds that exigent circumstances existed (as the lower court found), was unconstitutional, and, on this record, there is no evidence demonstrating a different exception to the warrant requirement. For reasons we will explain, we remand Rodríguez's case to the district court for further proceedings consistent with this opinion.

## The Facts

As is often the case in the motion-to-suppress context, the parties here do not share the same view of the facts. But when we review a challenge to a district court's denial of a motion to suppress, we are to "'view the facts in the light most favorable to the district court's ruling' on the motion."[1] United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (quoting United States v. Soares, 521 F.3d 117, 118 (1st Cir. 2008)). And "[w]e recite the key facts as found by the district court, consistent with the record support, noting where relevant [Rodríguez]'s contrary view of the testimony presented at the suppression hearing." United States v. Young, 835 F.3d 13, 15 (1st Cir. 2016) (citing United States v. Werra, 638 F.3d 326, 328 (1st Cir. 2011)).

---

[1] Here, the facts were found by the magistrate judge who held the suppression hearing. But after Rodríguez objected to the magistrate judge's recommended outcome, 28 U.S.C. § 636(b), the district court, in denying the motion to suppress, adopted the magistrate judge's findings and conclusions.

Officer Nelson Murillo-Rivera ("Officer Murillo"), who works for the Domestic Violence Division in the Ponce region of Puerto Rico, was off-duty on February 28, 2015 when he was approached by his wife's coworker (we refer to her -- using common law enforcement parlance -- as "the victim"), who complained that Rodríguez, with whom she had once been in a relationship, had been sending her threatening text messages. Officer Murillo testified that he saw these complained-of text messages in which Rodríguez was threatening to publish photos and videos of a sexual nature of the victim if she did not agree to rekindle their relationship.

Officer Murillo reported the above-described episode to the director of the domestic violence unit; later,[2] he was instructed by the district attorney to locate and arrest Rodríguez pursuant to "established procedure."[3] According to Officer Murillo, that procedure is why he did not get a warrant -- he said that, "according to [the procedure], . . . anyone alleged to have committed domestic violence must immediately be placed under arrest." And Officer Murillo testified that, in accordance with

---

[2] The passage of time between events is not crystal clear, particularly the time between the victim describing her complaint to Officer Murillo and the eventual excursion to Rodríguez's neighborhood.

[3] The procedure to which Officer Murillo was referring is Police Department General Order No. 2006-4. This procedure reflects what is required by P.R. Laws Ann. tit. 8 §§ 601 *et seq.*, known as the "Law to Prevent and Intervene with Domestic Violence." More on this later.

that procedure and because Rodríguez was a police officer, the proper course of action was to locate and disarm him, explain the complaint to him, then place him under arrest.

Intending to carry out this procedure, around midnight, Officer Murillo headed to Rodríguez's house in Yauco, Puerto Rico with several officers, one of whom was Officer Roberto Santiago ("Officer Santiago").[4] The officers had trouble locating Rodríguez's house until they came across a woman (who happened to be Rodríguez's sister) -- when the officers indicated that they were looking for Rodríguez, she led them to their mother's house, then went inside to tell Rodríguez the police were outside.

Officer Murillo testified that Rodríguez "immediately" came outside to the front of the house. Officer Murillo introduced himself, informed Rodríguez that a woman had filed a domestic violence complaint against Rodríguez, and asked if he knew the woman. Rodríguez said he knew the woman, and so Officer Murillo told Rodríguez that the officers needed to seize his service weapon, and he would have to go to the police station to be questioned.

Officer Murillo did not handcuff Rodríguez, despite the point of the visit being to arrest him, and he explained that was

---

[4] The parties dispute how many officers went off to Yauco in search of Rodríguez -- and later, how many officers entered the house -- but we do not get into this since it makes no difference to our conclusion.

because Rodríguez "was very cooperative and his family looked like really decent people."

Officer Murillo asked Rodríguez if he was armed -- he described the exchange as follows:

> . . . I asked him, "where is your weapon?" He said, "It's in my bedroom. I'll come right back and I'll go fetch it." Immediately I told him, "No, I'll go with you. You tell me where the weapon is and I'll seek it." To which he answered me, "Okay, no problem." He made a gesture with his hand and said, "follow me."

Rodríguez testified that he did not consent (verbally or nonverbally) for Officer Murillo to enter the house.

Officer Murillo followed Rodríguez into the house. Officer Santiago testified that he saw Officer Murillo follow Rodríguez into the house and decided to go in as well for the safety of Officer Murillo.

For the reason we previewed above, we do not spill much ink to describe the events that unfolded after this -- both in the house and later at the police station -- but we do provide enough to contextually round out the story. Once inside the house and then Rodriguez's bedroom, Officer Murillo retrieved the service weapon and also seized a Go-Pro camera, a white laptop, and a cell phone, all of which he believed could be related to the domestic violence accusation. Officer Santiago testified that he didn't scan or sweep the bedroom for weapons or anything else that could pose a threat to his safety, and that Rodríguez was passive during

the seizure.  Then, at the police station,[5] after Officer Murillo read Rodríguez his Miranda rights and Rodríguez signed a document indicating that he understood and wanted to invoke those rights, the two reviewed the complaint against Rodríguez, and Officer Murillo told Rodríguez he'd be spending the night in a cell. During this meeting, Rodríguez said (according to Officer Murillo), "I'm going to ask you for something from the bottom of my heart" -- "please let me erase something from the computer." Officer Murillo refused, then took Rodríguez to a cell.  The next day, again according to Officer Murillo, Rodríguez "desperately" asked Murillo, "Who's coming to look for me, ICE, ICE?"

Murillo got a search warrant for the seized electronics, and that's what ultimately put Rodríguez on the hook for the charges levied against him in the case before us -- authorities found videos and images of Rodríguez engaging in sexual conduct with the victim, as well as videos and images of Rodríguez engaging in sexual conduct with several female minors between the ages of 16 and 17 years old.  On March 26, 2015, a federal grand jury indicted Rodríguez on sixteen counts of production of child pornography, violating 18 U.S.C. § 2251(a) and (e), and another

---

[5] A pre-Miranda conversation took place in the police car en route to the station, too, but Rodríguez successfully moved to suppress statements he made during the ride, so we need not describe them here.

count of possession of child pornography involving prepubescent minors, violating 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).

## The Proceedings

Before trial, Rodríguez filed a motion to suppress -- specifically, he said the electronics that were seized and the files within them, his pre-Miranda statements, and the two post-Miranda statements all merited suppression. As is relevant to our analysis today, Rodríguez argued there was no consent to enter the house, nor did any other exception to the warrant requirement apply. The government opposed the motion, arguing solely that Rodríguez had consented to the officers' entry, and it would be "ludicrous" if officers had to wait outside while Rodríguez went in to fetch the weapon the officers were there to seize. The magistrate judge held two hearings, then issued a Report and Recommendation ("R&R") granting the motion as to the pre-Miranda statements, but denying it as to everything else.

In keeping with our approach to this point, we limit our recap of the R&R to that which is germane to our analysis, which, as we've said, is focused on the officers' entry into the house. The magistrate judge found that the officers had probable cause to arrest, and the arrest occurred the moment the police arrived at Rodríguez's home.[6] Critically, the magistrate judge concluded that

---

[6] Before us, Rodríguez does not challenge the probable cause to arrest or the moment of the arrest. So for purposes of his

- 8 -

the warrantless entry was constitutional, but there was no need to get into consent: "[i]t is unnecessary to determine whether [Rodríguez] consented, because officers were authorized under the exigent circumstances doctrine to enter the home for the limited purpose of securing the weapon they knew was inside." As to the seizure that followed the warrantless entry, the magistrate judge signed off on that as constitutionally permissible in light of the plain view doctrine.

Rodríguez objected to the R&R, and so the case went to the district judge for a de novo review. See 28 U.S.C. § 636(b). Rodríguez asserted that there was no record evidence to support the exigency determination -- indeed, the government had not even advanced that theory, so it had not proffered any evidence to support it. In the Memorandum and Order that followed, the district judge adopted in full the R&R's "factually and legally supported" findings and conclusions. Specifically, the district judge determined that the arrest was valid because the officers "had probable cause and there were exigent circumstances that justified entering the home."

In due course, the case went to trial.[7] Rodríguez was found guilty on all counts and sentenced to 262 months on counts

_____

appeal, probable cause is established, and he was arrested as soon as he stepped out of the house.

[7] Rodríguez explains that he went to trial to preserve the suppression issues now before us.

1-16 and 240 months for count 17, to be served concurrently with each other, and a fifteen-year term of supervised release. This timely appeal followed.

**Discussion**

In undertaking our review of the denial of the motion to suppress, we review the lower court's factual findings for "clear error," Camacho, 661 F.3d at 723, and as to the legal conclusions, such as "application of the law to the facts . . . and the district court's ultimate legal decision to grant or deny the motion to suppress," we review those de novo, id. at 724. "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." United States v. Delgado-Pérez, 867 F.3d 244, 250 (1st Cir. 2017) (quoting United States v. Winston, 444 F.3d 115, 123–24 (1st Cir. 2006)).

To aid in our review, we lay out some tried-and-true Fourth Amendment principles. It is axiomatic that the Fourth Amendment requires that all searches and seizures be reasonable, and the Supreme Court has ruled that reasonableness requires there be probable cause for the search or seizure and that a warrant is issued. See U.S. Const. amend IV; Katz v. United States, 389 U.S. 347, 357 (1967). Indeed, "'the Fourth Amendment has drawn a firm line at the entrance to the house' and warrantless entries into a home 'are presumptively unreasonable.'" Morse v. Cloutier, 869

- 10 -

F.3d 16, 23 (1st Cir. 2017) (quoting Payton v. New York, 445 U.S. 573, 586 (1980)).  However, there are exceptions to the warrant requirement, such as the two at issue in this case:  consent and exigent circumstances.  See, e.g., Pagán-González v. Moreno, 919 F.3d 582, 591 (1st Cir. 2019) (noting consent is "a jealously and carefully drawn exception to the warrant requirement" (quoting Georgia v. Randolph, 547 U.S. 103, 109 (2006) (internal quotations omitted))); United States v. Almonte-Báez, 857 F.3d 27, 34 (1st Cir. 2017) (concluding that exigent circumstances justified a warrantless entry into an apartment).

Before us, the basic Fourth Amendment principles we just spelled out are the bedrock of Rodríguez's appellate contentions. Rodríguez challenges the warrantless entry, arguing that it was presumptively unreasonable, and, on this record, no exception to the warrant requirement existed.  Homing in on the district court's findings only, he says there is no record evidence to support an exigency determination:  he was unarmed, had not threatened violence or been violent (there was no indication the officers believed he had been or would become violent -- quite the opposite since he was never handcuffed), had no history of violence, and, on the facts of his case, the presence of a gun in the house wasn't enough, on its own, to demonstrate exigent circumstances warranting entry, especially when the presence of the gun wasn't

- 11 -

even connected to the domestic violence complaint that prompted the officers' visit in the first place.

He's right. Here's how our analysis will go: the record evidence does not support a finding of exigent circumstances that comports with our case law; consent to enter was not addressed by the lower court; so, since a consent finding depends on credibility determinations that do not exist on this record, and we cannot make those credibility determinations for ourselves, consent as a justification for upholding the entry on appeal isn't a viable way into the house either.[8] The upshot of all of this is that, on this

---

[8] To the extent the government points to General Order No. 2006-4 to say the entry into the home was legal or somehow consensual, we cannot agree. There simply is nothing on this record to allow us to do so. Indeed, even assuming such an administrative procedure can permissibly strip those to whom it applies of certain constitutional protections and rights, and further assuming it can operate as an automatic consent to warrantless entry into a home or automatically creates an exigency (the need to find and seize service weapons of those accused of domestic violence), the record is devoid of any explication of how this administrative search/seizure procedure is carried out. See, e.g., Ruskai v. Pistole, 775 F.3d 61, 68 (1st Cir. 2014) (explaining the balancing act of looking at the public interest in the policy and the privacy concerns affected by it, Nat'l Treas. Emps. Union v. Von Raab, 489 U.S. 656, 667-68 (1989), laying out the various considerations to be taken into account when assessing administrative search policies (including gravity of public concerns, how the search advances the public interest, and the degree of interference with individual liberty), and collecting cases outlining variations on this detailed analysis). Here, the government conceded that the Order itself is not even in this record. All we have to go on to assess the validity of the notion that it's legitimate to use this procedure to make an end-run around the unconstitutionality of a warrantless entry is the language of the procedure as described by Officer Murillo. And frankly, that description seems to undercut the government's

- 12 -

record, the one exception currently before us does not operate to excuse the unconstitutionality of the warrantless entry.

So let's discuss exigent circumstances. Recall that in this case, the magistrate judge determined (and the district court accepted) that the warrantless entry was permissible due to exigent circumstances, which we've described as "a fancy way of saying 'there is an emergency or other urgent need.'" Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 19 n.4 (1st Cir. 2016) (quoting United States v. Allman, 336 F.3d 555, 557 (7th Cir. 2003) (Posner, J., for the court)). Generally, "a warrantless entry into a person's dwelling may be permitted if exigent circumstances arise," United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005) (internal quotations omitted), and, in order to find exigent circumstances, "the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant,'" id. (quoting Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999)). We've explained that "[t]he exigent circumstances doctrine reflects an understanding and appreciation of how events occur in the real world," Almonte-

---

position anyway since it instructs that the person in question be disarmed -- here, given that the facts revolve around the officers' entry into the house to seize Rodríguez's service weapon, it clearly is undisputed that Rodríguez didn't have the gun on him at the time of the warrantless entry. All of this to say, on this record, we reject any argument that General Order No. 2006-4 serves as a means to enter a house without a warrant.

Báez, 857 F.3d at 31, observing that "[p]olice officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving," id. (quoting Kentucky v. King, 563 U.S. 452, 466 (2011)).  To that end, we have indicated that the "best examples" of exigent circumstances include "hot pursuit of a felon, imminent destruction or removal of evidence, the threatened escape by a suspect, or imminent threat to the life or safety of the public, police officers, or a person in residence."  Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000).

Here, the lower court found that Rodríguez's case was "most similar to the final category" listed above, saying the exigency was that the police needed to "secur[e] the weapon they knew was inside."  In so reasoning, the magistrate judge relied on some non-controlling cases to support the conclusion that the officers didn't have to wait outside while Rodríguez retrieved the gun, and people being inside the house along with the gun justified a warrantless entry.  See United States v. Shannon, 21 F.3d 77 (5th Cir. 1994); United States v. Guarente, 810 F. Supp. 350 (D. Me. 1993); United States v. Rodriguez, 503 F. Supp. 15 (D.P.R. 1980).  In particular, the magistrate judge leaned on United States v. Zetterman, No. CR-09-54-B-W, 2009 WL 3831388 (D. Me. Nov. 16, 2009), report and recommendation adopted, No. CR-09-54-B-W, 2010 WL 147805 (D. Me. Jan. 11, 2010), to support his conclusion that the exigent circumstance was a gun being inside the house, and

- 14 -

that exigency entitled the officers to warrantlessly "enter the home for the limited purpose of retrieving the firearm."

The government tells us this is supportable. Indeed, the government agrees with the exigency justification below as a baseline,[9] and, by way of explanation, offers the following reasoning: the police were compelled to go to Rodríguez's house to execute his arrest pursuant to General Order No. 2006-4; that same protocol required them to seize Rodríguez's gun; they knew his gun was inside the house; they also knew Rodríguez was "well versed in the use of firearms"; and this culminates in the conclusion that exigent circumstances existed and "any reasonable arresting officer with knowledge that the suspect has a firearm would not idly stand by at the front door and let the unaccompanied suspect retrieve a dangerous weapon." In support, the government points to United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993), where we upheld a search for a weapon under the exigent circumstances exception because the search was "proportionate

_____

[9] In discussing the government's position on exigency, by the way, we are mindful of the fact that the government has the burden of proof when it comes to demonstrating exigent circumstances. See, e.g., Samboy, 433 F.3d at 158. This is a problematic logistical reality on these facts since the government didn't raise exigency below to justify the warrantless entry (the lower court did that on its own), and therefore the government hadn't introduced evidence to support the officers' supposed belief that exigent circumstances were afoot -- or their reliance on any such exigency to enter the house. Ultimately, as will become apparent from our analysis, this burden hasn't been carried.

. . . , limited in its range, [and] specific in its object." Id. at 27.

But, as Rodríguez counters, the government's position, like the lower court's before it, is unsupported by our case law. Lopez, for instance, differs from Rodríguez's case in a few critical ways that undercut any reliance on it. In Lopez, a cocaine dealer had recently threatened his victim on-scene with a sawed-off shotgun (someone called the police and reported as much), and the victim was still there when the police arrived. 989 F.2d at 25. The police saw and pursued a person fleeing the scene, who turned out to be the defendant, Lopez (an associate of the shotgun-wielding dealer and a self-described authorized user of the apartment in which the threat occurred), believing at the time that Lopez did the threatening (as opposed to his associate, the cocaine dealer). Id. We made it clear there -- in what we called a close case, id. at 26 -- that those factors played central roles in our conclusion, especially as to the use and whereabouts of the firearm at issue: "[t]he most important element [was] that the police had reason to believe that [the defendant] had a sawed-off shotgun nearby, which had been used only shortly before to threaten [the victim]," id.

Here, Rodríguez had threatened (in a generic sense) his victim, yes, but not with a gun and not face-to-face. Additionally, he was not armed at any point during his encounter

with his fellow officers, nor had he given the officers any indication that he would turn violent and become a danger to them. Indeed, they never handcuffed him nor did a protective sweep, apparently never in fear for their safety as Rodríguez remained passive, nor did they ever express any concern that some other resident of the house might access the gun to hide or misuse it. Moreover, Rodríguez did not flee when the officers showed up, but instead was, by the officers' own accounts, fully cooperative. And although the officers in Rodríguez's case knew there was a gun "nearby,"[10] as was the case in Lopez, this gun was not alleged to have played a role in the recent commission of a violent crime against a victim who was still on-scene.[11] The fact that the officers knew a gun was in the house, without more, is not

---

[10] Another thing: at oral argument, this court queried whether the protocol-says-we-had-to-enter-to-seize-the-gun rationale would be affected at all if Rodríguez -- arrested, unarmed, under control, but not offering consent to enter -- had been, say, two miles from the house rather than just outside it. The government conceded that the two-mile scenario would require a warrant to enter the house to retrieve the gun. And although the government later tried to walk back that concession (without offering any reasoning to explain the change of heart), on these facts, we see no difference between an unarmed, unthreatening Rodríguez being two miles away or ten yards away -- neither undercuts the need for a warrant.

[11] Officers in Lopez also were concerned with securing the scene (a multi-tenant building) and making sure no other potentially violent actors were lurking about. 989 F.2d at 26, 27. Here, no one ever suggests that officers believed there might be others in the house who posed such a threat that exigency justified their warrantless entry.

- 17 -

sufficient under our precedent to demonstrate exigent circumstances.[12]

With respect to the government's suggestion that it would be "ludicrous" to let Rodríguez go get the gun so the officers could carry out their mission of seizing it, all we can say is that, on these facts, the perceived ludicrousness of a course of action does not, on its own, create an exigency. And, although the government points to the inconveniences associated with the logistics of getting a warrant, no one has asserted that securing a warrant was not an option or that those inconveniences would in any way outweigh Rodríguez's Fourth Amendment interests.

In the end, this particular record, viewed in its totality, does not reflect one of "those crisis situations when there is compelling need for official action and no time to secure a warrant." United States v. Irizarry, 673 F.2d 554, 557 (1st Cir. 1982); see also Samboy, 433 F.3d at 156-57. No emergency, no urgency, no actual or threatened violence or gun violence, no armed suspects, no fleeing, no split-second decisions by police in tense moments, no legal reason not to get a warrant. At bottom, the

---

[12] Like Lopez, the cases cited in the R&R in support of the exigency analysis and conclusion are distinguishable from the facts here in a variety of fundamental ways -- for starters, unlike in those cases, there was no allegation of physical violence here, and certainly not one involving a gun. Those cases simply do not move the needle for us, and we need say no more.

facts of this case simply do not square with our exigent-circumstances case law, and it was error to deny the motion to suppress on this basis.  See generally, Almonte-Báez, 857 F.3d at 31; Decker, 845 F.3d at 19 n.4; Samboy, 433 F.3d at 156-57.

## Next Steps

Because we conclude that the entry into the home on the basis of exigency was unconstitutional, that cannot serve as justification for the search and seizure that followed.  But there is more.  Recall that consent would be another way around the warrantless entry problem.  Indeed, before the lower court, consent was the government's original and sole theory explaining why the warrantless entry was not unconstitutional.  But the district court, by way of the R&R, explicitly opted to bypass that argument.  As such, there is no consent determination (whether consent to enter was given and whether that consent could serve as an independent basis for the officers' entry) for our review, and the record in its current state is not sufficient to permit us to consider and decide the issue in the first instance.  We do not think it appropriate to hold this omission against the government; the government squarely raised consent as its justification for the entry and Rodríguez defended on that ground.

Accordingly, we **remand** this case to the district court to make factual findings and determine whether consent to the entry was given.  See, e.g., United States v. Gandia, 424 F.3d 255, 265

(2d Cir. 2005) (taking a similar approach).  This panel retains jurisdiction over this matter.