# United States Court of Appeals
## For the First Circuit

No. 20-1871

UNITED STATES OF AMERICA,

Appellant,

v.

PRANEETH MANUBOLU,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Thompson, Kayatta, Circuit Judges,
and Woodlock, District Judge.*

Julia M. Lipez, Assistant U.S. Attorney, with whom Halsey B. Frank, U.S. Attorney, was on brief, for appellant.
Walter F. McKee, with whom Matthew D. Morgan, Kurt C. Peterson, and McKee Law LLC, P.A., were on brief, for appellee.

September 14, 2021

---

* Of the District of Massachusetts, sitting by designation.

**THOMPSON, <u>Circuit Judge</u>.**  This story of an early morning drunk-driving crash with multiple fatalities is all too familiar. But the scourge of drunk-driving deaths does not mean police can ignore the Fourth Amendment's requirement to obtain a warrant before drawing an individual's blood to test for blood alcohol content (BAC).  <u>Schmerber</u> v. <u>California</u>, 384 U.S. 757, 770-71 (1966).  Exigent circumstances may permit warrantless blood draws before the body naturally dissipates the BAC.  <u>Mitchell</u> v. <u>Wisconsin</u>, 139 S. Ct. 2525, 2533 (2019) (plurality opinion) (noting a "spectrum" of exigent circumstances); <u>Missouri</u> v. <u>McNeely</u>, 569 U.S. 141, 149 (2013).  This appeal asks us to consider whether the district court erred by suppressing BAC evidence from a warrantless blood draw because it found the police crossed the constitutional line.  We respectfully disagree with the court's ruling and come out the opposite way.

## I.  Background[1]

### A.  The Late-Night Investigation

At 2:48 A.M. on August 31, 2019, Officer Judson Cake of the Bar Harbor Police Department (BHPD) responded to a single car

---

[1]  We take "'the facts in the light most favorable to the district court's ruling'" when we review "a challenge to a district court's" decision concerning "a motion to suppress." <u>United States</u> v. <u>Rodríguez-Pacheco</u>, 948 F.3d 1, 3 (1st Cir. 2020) (quoting <u>United States</u> v. <u>Camacho</u>, 661 F.3d 718, 723 (1st Cir. 2011)).  We will accordingly narrate the facts based upon the district court order and any other reliable evidence in the motion to suppress record. <u>United States</u> v. <u>Simpkins</u>, 978 F.3d 1, 4 (1st Cir. 2020).

crash on Park Loop Road in Acadia National Park (a 19-or-so-mile road taking people to various sites in the park, which, like Bar Harbor, is located on Mt. Desert Island just off the coast of Maine).[2] Officer Cake got to the scene swiftly, arriving at 2:56 A.M. He observed Praneeth Manubolu standing on the side of the road, talking into a cellphone. Off in the woods, was a badly damaged, two-door, 2019 Dodge Challenger[3] -- wrecked despite the road being dry, in good repair, and free of noticeable defects (it seems to have hit a tree at high speed). At about 3 A.M., Jerrod Hardy and Liam Harrington arrived, who were the two other BHPD officers on the overnight shift. At first glance, it appeared that the crash had crushed the two male passengers in the back seat of the car, and the officers could not get them out. The officers managed to remove a female from the front passenger seat

---

[2] The attentive reader likely noticed that local police responded to an accident that occurred on federal land. National Park Rangers (who oversee the park while working for the National Park Service) would have normally responded, but the Acadia crew of rangers stopped working between 10 P.M. and midnight at that time of year. BHPD and the National Park Service had what is known as a memorandum of understanding, which spelled out that BHPD would first respond to serious calls when the rangers were off duty and then call in the rangers if necessary (as it happened that night).

[3] So badly damaged was the vehicle that officers had to use the VIN number to identify Manubolu as the car's owner.

and they began to perform CPR. The scene, as described by multiple officers, was "horrific."

When the EMTs showed up at 3:12 A.M., it was clear to the officers that all three passengers had already died. The rescue operation, according to the officers, turned into an investigation. Officer Cake had already begun photographing the scene, and Southwest Harbor Police Department (a neighboring precinct) sent resources to close down the Park Loop Road.[4] Officers Cake and Hardy also questioned and observed Manubolu.

At about 3:24 A.M., National Park Ranger Brian Dominy made it to the scene. He and the BHPD officers determined the rangers would take the lead in the investigation, yet the BHPD officers remained to assist him in the early morning investigation because, in the words of Officer Cake, Ranger Dominy "didn't really have any help with him." Only three rangers who could respond lived on the island and it took them some time to arrive. According to Ranger Dominy, his team did not usually handle triple fatality accidents, and he felt "spread kind of thin." He started photographing and documenting the scene. He and BHPD also called in a crash scene reconstruction expert. Ranger Dominy needed to identify the bodies and work with the medical examiner, but he could not move the bodies until the reconstruction expert arrived.

---

[4] The record does not hint that they helped the investigation in any other manner.

The two other available rangers showed up later, one at about 4 or 4:15 A.M. and one at 5 A.M. Ranger Dominy put the first (Deputy Chief Ranger Therese Picard) to work mapping and collecting data with the crash scene reconstruction expert,[5] and he sent the second (Ranger Darren Belskis) to the hospital to bring Manubolu into custody once his medical care was completed.[6] Ranger Dominy testified that he did not "clear the scene" until 7 A.M.

### B. Figuring Out Manubolu's Inebriation

Once the passengers were clearly beyond rescue and the ambulance had arrived, Officer Hardy turned his attention to Manubolu, who was in the ambulance with the EMTs. During his chat with Manubolu, Officer Hardy observed that Manubolu's eyes were bloodshot and that there was an "odor of alcohol coming" from his breath. Manubolu admitted to consuming "two shots of whiskey" when he had gone to a tavern for dinner and drinks with his friends

---

[5] No one testified to the exact time that the reconstruction expert showed up, but we can assume he was there by around 4 A.M. when Ranger Dominy had Deputy Chief Picard help out.

[6] The record does not reflect precisely what Officer Harrington did after he stopped trying to help the dead passengers. Officer Cake testified that "we" (presumably he and Officer Harrington because Officer Hardy was with Manubolu and there were no other BHPD officers) helped Ranger Dominy with the investigation. The district court also commented that "Ranger Dominy was the only ranger on the scene for a long period and required the assistance of the BHPD officers" (emphasis on the plural). Ranger Dominy remembered Officer Cake assisting him, but he did not mention Officer Harrington. Officer Harrington did not testify at the motion to suppress hearing so his involvement remains unclear on the record before us.

(the passengers in the car) before attending a dance club.[7] It seems that the friends had thereafter walked around "stargazing" before hopping into Manubolu's car and driving to the campsite in Acadia where they were supposed to spend the night. Ranger Dominy knew that bars in Bar Harbor, where the group had been out, closed at 1 A.M. Given Manubolu's statements about drinking, he estimated that Manubolu's last drink was at about 12:45 A.M. (presumably last call).

The EMTs wanted Manubolu to go to the hospital to inspect him for internal injuries given the "traumatic crash." Manubolu initially resisted, but finally relented so long as Officer Hardy went along with him. Before Officer Hardy left, he relayed information about his conversation with and personal observations of Manubolu to Ranger Dominy and the two had a brief discussion about how to get evidence of Manubolu's BAC.

Notwithstanding the evident signs of intoxicated driving, the responding law enforcement officials did not conduct any field sobriety tests because of Manubolu's injuries. Officer Hardy explained that he feared Manubolu might have had a head or internal injury because Manubolu had a "goose egg-sized bump" below his right eye. Officer Cake also testified that Manubolu should have gone to the hospital (in part because the EMTs encouraged

---

[7] As a quick aside, Manubolu had met the passengers on an app for people interested in group camping trips.

Manubolu to do so), even though, in addition to the possible head or internal injury, he only "had some cuts on his head" and did not look "too beat up from" the accident.

Manubolu's injuries also explain why he was not breathalyzed. Because the BHPD officers did not carry portable breathalyzers in their cruiser, they would have needed to bring Manubolu back to the station to conduct one. Given Manubolu's injuries, the severity of which was unknown, and the EMTs' recommendation, Officer Hardy concluded that the "goal [was] to get [him] to the hospital as soon as possible to be medically treated."[8]

Without the field sobriety test and without any breathalyzer, Ranger Dominy and Officer Hardy agreed that Hardy would go with Manubolu to the hospital to get a blood draw. A Maine statute at the time permitted officers to take warrantless blood draws from those suspected of drunk driving in a fatal accident even without exigent circumstances. See Me. Rev. Stat. tit. 29-A, § 2522.[9] Because of that statute, Ranger Dominy believed that Officer Hardy, who had assumed physical custody of Manubolu, "had authority . . . to obtain a blood sample" without a warrant and without exigent circumstances. Based on Supreme Court

_____

[8] There was no breathalyzer machine at the hospital.
[9] The statute was held unconstitutional soon thereafter. See State v. Weddle, 224 A.3d 1035, 1045 (Me. 2020).

- 7 -

precedent, a National Park Service regulation, however, prohibited warrantless blood draws in national parks like Acadia absent some exigent circumstance. See 36 C.F.R. 4.23(c)(3).[10] Ranger Dominy was also aware of the rule.

Officer Hardy and Manubolu left for the hospital in Bar Harbor around 3:53 A.M., arriving at about 4 A.M. Once at the hospital, Officer Hardy invoked the Maine statute. He ordered the warrantless blood draw without Manubolu's consent at 4:24 A.M., which was about 90 minutes after the crash took place.

### C. Attempts (Or Lack Thereof) to Get a Warrant

No matter the federal regulation prohibiting warrantless blood draws absent exigent circumstances from suspected drunk drivers in federal parks, Ranger Dominy never discussed getting a federal or state warrant with any of the BHPD officers.

Ranger Dominy did try to reach the on-call Assistant United States Attorney (AUSA) at 3:15 A.M. (about an hour before the warrantless blood draw), but the AUSA did not answer. Ranger

---

[10] The full regulation reads:

Absent exigent circumstances, an operator cannot ordinarily be required to submit blood samples for the purpose of determining blood alcohol and drug content unless it occurs through a search warrant. An authorized person who has probable cause to believe that an operator of a motor vehicle within a park area has [driven while intoxicated] shall get a search warrant, except when exigent circumstances exist, to obtain any blood samples from the operator for the purpose of determining blood alcohol and drug content.

Dominy tried another AUSA soon thereafter, who also did not pick up. He finally reached a third AUSA at 4:13 A.M. (minutes before the warrantless blood draw, but after Hardy and Manubolu had left for the hospital) who said he would try to reach the on-call AUSA. Officer Cake also tried to reach an on-call Hancock County Assistant District Attorney, but the person did not answer.

The district court found that Ranger Dominy did not begin to pursue a warrant until 4:45 A.M. (after the warrantless blood draw had already occurred) when the on-call AUSA finally phoned him back. It was only then that Ranger Dominy told the on-scene team they would need to get a search warrant. To get it under the protocols then in place, Ranger Dominy would have needed to provide an affidavit or statement of probable cause to an AUSA, who would have drafted the warrant for Ranger Dominy to review before it would have been transferred to a federal magistrate judge to consider. Rangers had telephonic capabilities, but they could not call magistrates directly (apparently a previous magistrate judge had not appreciated receiving direct calls from federal law enforcement officials). Ranger Dominy did not have a laptop in his truck, so he would have had to return to his office six miles from the accident to draft an affidavit.

In accordance with prior state law, none of the BHPD officers attempted to get a warrant. But, if they had, the state warrant procedure was quite onerous. The BHPD did not have

electronic or telephonic warrant capabilities, so they would have had to return to the station to draft and to print the application and affidavit in support thereof.  Every warrant application and affidavit had to be submitted in writing, be approved by a supervisor and by the District Attorney's office, and then the applying officer had to swear any warrant affidavit in front of a judge or justice of the peace, which at that early hour required driving far to find an available judicial officer.[11]  Overall the process could have taken three to five hours at that time in the morning (it had taken five hours in a similar case).[12]

Ranger Dominy testified at the suppression hearing that he believed at the time that exigent circumstances (in addition to Maine law) justified the warrantless blood test.  He pointed to the three fatalities, the "time frame of when the bars closed and when the driver had admitted to Officer[s] Hardy and Cake that he

---

[11] Even if the BHPD officers had telephonic warrant capabilities, they did not have a list of judges' or justices of the peace's phone numbers.  And they were unsure whether they would have been able to contact the judicial officers without approval from their supervisor first anyway.

[12] Officer Hardy testified to pursuing a warrant for a similar crash with serious injuries that occurred between Manubolu's accident (August 31, 2019) and the motion to suppress hearing for this case (March 2, 2020).  For that crash, he testified that "[w]ith that recent case law, we opted to go with a search warrant for the blood draw."  The Maine Supreme Judicial Court ruled the state's warrantless blood draw statute unconstitutional on January 29, 2020.  See Weddle, 224 A.3d at 1045.  The district court implied that "recent case law" pointed to the same Supreme Court doctrine that caused the National Park Service to amend its regulations, but that is not clear from the record.

had last drank," as well as his overall assessment of the situation, i.e., arriving at 3:30 A.M. to the wreckage of a terrible and deadly car accident with a possibly intoxicated driver. Ranger Dominy felt there was simply too much valid police work to be done before he could leave the scene to draft a warrant affidavit. As for the other two rangers who could have drafted an affidavit (Picard and Belskis), they were working on other tasks; one was engaged with helping the reconstruction expert and the other waited at the hospital to take Manubolu into custody.[13], [14]

### D.  The Charges and Suppression Motion

The federal government charged Manubolu with three counts of manslaughter (18 U.S.C. § 1112(a)) and other intoxicated-driving related crimes.[15]  In time, Manubolu filed a

---

[13]  Nevertheless, Ranger Dominy did get a warrant later once he contacted the AUSA and finished investigating the scene. Ranger Dominy wrote up the warrant affidavit after he left the scene at 7 A.M.  The warrant came at 10:30 A.M., well after the time of the blood draw. The government's brief says the district court got the issuing time wrong.  The warrant was time-stamped at 12:09 P.M. The government, however, has conceded that it is not challenging the district court's findings of fact, so we'll go with what the district court said.

[14]  The record is silent about what Ranger Belskis did after arriving at the hospital, although we note that he arrived after the warrantless blood draw had already taken place.

[15]  The precise charges were one count of knowingly or intentionally operating a motor vehicle under the influence, see 36 C.F.R. § 4.23(a)(1), one count of operating under the influence with a BAC over .08, see id. § 4.23(a)(2), and one count of unsafe operation of a motor vehicle for driving at an unreasonable speed, see id. § 4.22(b)(1).

motion to suppress evidence from the warrantless blood draw.[16]  For reasons we detail more later, the district court agreed, suppressing the evidence.  The government timely appealed and here we are.

## II.  Analysis

The only issue on appeal is whether the district court, as the government contends, erred by suppressing the results of the warrantless blood draw because no exigent circumstances were present.  The government asserted below, as it does here, that even if the officers believed they could draw blood under the Maine statute, exigent circumstances permitted the draw due to the complexities of the investigation, Manubolu's pressing health needs, the seriousness of the crash, the resulting fatalities, and the jurisdiction's elongated warrant processes.  In the

---

[16]  The hospital independently drew Manubolu's blood and the government subpoenaed those results.  However, the parties agreed that the court should nonetheless litigate the constitutionality of the warrantless blood draw ordered by the police because the parties would still end up litigating its constitutionality even if the hospital blood draw results were introduced.  The hospital used a procedure to draw the blood that differed from how police do it, in part because hospitals swab the draw cite with alcohol.  Defendants have apparently often attacked the reliability of BAC evidence from hospital blood draws.  So, even if the hospital results were admissible, the government would have introduced the warrantless blood draw ordered by police which comported with apparently more reliable standards.  The district court agreed to rule on the constitutionality of the test ordered by Officer Hardy because the government was dead set on introducing it.  Accordingly, the only question before us is the constitutionality of the warrantless blood draw ordered by Officer Hardy.

government's view, the situation was such that "it would have taken law enforcement officers" too much time to get a warrant, thereby compromising the value of the BAC evidence. Manubolu and the district court looked at the facts less favorably for the government in ways we need not detail yet. The government's framework sets the stage for our discussion. But before we begin, a primer about warrantless blood draws and the Fourth Amendment would be helpful for understanding the constitutional issue we must confront.

## A. The Fourth Amendment and Warrantless Blood Draws

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches" such that "no Warrants shall issue, but upon probable cause." Mitchell, 139 S. Ct. at 2534 (plurality opinion) (quoting U.S. CONST. amend. IV). A blood draw constitutes a search under the Fourth Amendment for which law enforcement must normally get a warrant. See Birchfield v. North Dakota, 136 S. Ct. 2160, 2178 (2016). However, exceptions to the warrant requirement exist. Illinois v. McArthur, 531 U.S. 326, 330 (2001). One of these exceptions is "exigent circumstances," which means that the "needs of law enforcement [are] so compelling that a warrantless search is objectively reasonable under the Fourth Amendment," so long as

the officers have probable cause.[17]  McNeely, 569 U.S. at 148-49 (quoting Kentucky v. King, 563 U.S. 452, 460 (2011)).  That's just a roundabout way of saying that we permit warrantless searches when "there is an emergency or other urgent need" getting in the way of police applying for a warrant.  United States v. Rodríguez-Pacheco, 948 F.3d 1, 7 (1st Cir. 2020) (quoting Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 19 n.4 (1st Cir. 2016)).

But, let's spend a little more time narrowing down that broad definition.  Several types of events fit the parameters of exigent circumstances, but the one we care about right now is the "imminent destruction or removal of evidence."  Id. (quoting Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000)).[18]

Courts often encounter imminent destruction of evidence issues in drug cases when suspects are caught flushing drugs down the toilet, see King, 563 U.S. at 461, but it is also the case that a drunk-driving suspect's BAC is naturally destructive because it diminishes at approximately .01% to .025% per hour (depending on an individual's characteristics), see Mitchell, 139 S. Ct. at 2536.  Projecting a BAC reading back in time thus

_____

[17]  Manubolu, with good reason, does not challenge that the officers had probable cause to believe he was driving drunk.

[18]  The other categories of exigent circumstances (not relevant to this appeal) are "hot pursuit of a felon, . . . , the threatened escape by a suspect, or imminent threat to the life or safety of the public, police officers, or a person in residence." Rodríguez-Pacheco, 948 F.3d at 7 (quoting McCleod, 211 F.3d at 171).

seemingly becomes less precise as the hours wear on because the significant variation in an individual's dissipation rate makes it harder to work backwards with each passing hour.  In other words, the natural destruction means that "a significant delay in testing [for BAC] will negatively affect the probative value of the [BAC] results" because later draws allow for less precise estimates. McNeely, 569 U.S. at 152.  Nonetheless, the dissipation of BAC does not alone create a "per se exigency."[19]  Id. at 156.

Courts, of course, know that there is always some delay between the need for BAC evidence and the actual time of the blood draw.  Id. at 153.  For an exigency to exist when a suspect's BAC is dissipating, other factors must contribute to lengthening that "inevitable" delay, such that law enforcement could not "reasonably obtain a warrant" before the "efficacy of the search" for the suspect's BAC is "significantly undermin[ed]" because the BAC has dissipated too much; otherwise a warrant is required.  Id. at 152-53.  In other words, if circumstances make getting "a warrant impractical" in the face of dissipating BAC, exigent circumstances will be present.  Id. at 153-54.

Law enforcement must "reasonably believe" that the circumstances required such "immediate action" that they could not wait to obtain a warrant.  Rodríguez-Pacheco, 948 F.3d at 7

---

[19]  The Supreme Court has, however, categorically permitted warrantless breathalyzer tests.  Birchfield, 136 S. Ct. at 2184.

(quoting United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005)).  We base our determination of that reasonability on how things happen in the real world, recognizing the difficult and unpredictable circumstances officers often face.  See id. (quoting Almonte-Báez, 857 F.3d at 31).  Succinctly put, we examine the "totality of the circumstances" when deciding whether an exigency supports a warrantless blood draw.  McNeely, 569 U.S. at 145; see also Samboy, 433 F.3d at 158 (looking to "case-specific facts" (quoting United States v. Hidalgo, 747 F. Supp. 818, 828 (D. Mass. 1990))).

The dissipation of BAC is one factor to consider, but the Supreme Court has also made clear we should examine how the process of obtaining a warrant can further delay when the blood draw happens.  See McNeely, 569 U.S. at 155.  Technology, specifically telephonic or electronic warrant capabilities, has made it far simpler and faster for officers to obtain warrants, especially with drunk-driving cases where the probable cause statement is somewhat formulaic (suspect had bloodshot or glossy eyes, emanating odor of alcohol, slurred speech, unsteadiness, open container of alcohol, etc.).  See id.  Yet, technological improvements do not guarantee that an officer can get a warrant, especially when confronted with a late-night arrest for suspected drunk driving.  Id.  Courts must consider the "warrant-application process," even if a jurisdiction has not updated its procedures to

meet modern capabilities, because it "inevitably take[s] some time" to complete the warrant and to have a responsible magistrate review it.  Id.  There might also be "time-consuming formalities." Id.

Other factors -- beyond delays in getting a BAC test due to the warrant process -- affect the exigent circumstances calculation.  If there is an accident "where time had to be taken to bring the [suspect] to a hospital and to investigate the scene of the accident," because of the nature of the crash or the lack of investigative resources to assist, then there might not have been "time to seek out a magistrate and secure a warrant" for the blood draw.  Schmerber, 384 U.S. at 770-71.

Recently, a plurality opinion for the Supreme Court summarized the doctrine borne from McNeely and Schmerber as establishing a "spectrum" of exigencies that permits a warrantless blood draw when:  "(1) BAC evidence is dissipating; and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application."[20]

_____

[20]  "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"  Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)).  In Mitchell, Justice Thomas concurred with the result, but argued (as he had done in dissent in McNeely) that the dissipation of BAC constitutes exigent circumstances on its own.  139 S. Ct. at 2539 (Thomas, J., concurring).  Mitchell's new addition to the canon of

Mitchell, 139 S. Ct. at 2537.  The point being that in McNeely there was no exigency -- it was a routine drunk-driving stop without an accident or incident[21] -- while in Schmerber there was an exigency -- because of the accident, attendant injuries, investigative needs, and limitations on police resources.[22]  See

warrantless blood draws is the rebuttable presumption that exigent circumstances for a warrantless blood draw exist whenever, as was the case in Mitchell, the suspected driver is unconscious. Id. at 2539.  Because that position is "the less sweeping opinion" than Justice Thomas's push for a per se rule, it is the one we will consider to be controlling.  United States v. Johnson, 467 F.3d 56, 64 (1st Cir. 2006) ("[T]he 'narrowest grounds' approach makes the most sense when two opinions reach the same result in a given case, but one opinion reaches that result for less sweeping reasons than the other.  When applied to future cases, the less sweeping opinion would require the same outcome in a subset of the cases that the more sweeping opinion would.").  Neither party alleges Manubolu was unconscious (which is good because he wasn't) and they instead rely on Mitchell for its articulation of the test to determine whether exigent circumstances are present more generally for a warrantless blood draw.

[21]  Technically, McNeely did not reach the question of whether exigent circumstances existed for the case's particular facts because the state only argued below that courts should bless a per se exigency whenever there was probable cause to believe impaired driving had occurred.  See 569 U.S. at 163-64.  Nonetheless, the Court summarized why the trial court found no exigency, which included the lack of pressing needs and the ready availability of a prosecutor and judge to expedite the warrant process.  Id.

[22]  At least one law review note has pointed out that Mitchell broadens how to gauge an exigency by asking only whether some law enforcement needs "might take priority over a warrant application" rather than whether any such needs actually inhibited the warrant process, as the Court implied was the test in McNeely and Schmerber.  Fourth Amendment-Search and Seizure-Warrantless Blood Draws- Mitchell v. Wisconsin, 133 Harv. L. Rev. 302, 309 (2019) (emphases added).  However, we choose to interpret the Supreme Court as remaining consistent in its doctrine when it does not expressly say otherwise.  See Grajales v. P.R. Ports Auth., 831 F.3d 11, 30 n.24 (1st Cir. 2016) ("In the event that [a Supreme Court decision] is no longer good law, it should be for the Supreme

- 18 -

Fourth Amendment-Search and Seizure-Warrantless Blood Draws-<u>Mitchell v. Wisconsin</u>, 133 Harv. L. Rev. 302, 308 (2019). We key in on the second part of the <u>Mitchell</u> test (pressing needs) because neither party here disputes the first (the dissipation of BAC evidence) and because the district court relied upon the second.

In an unfortunate number of instances when there is a drunk-driving accident, like Manubolu's, the officers "may have to deal with fatalities" or provide first aid until medics arrive at the scene. <u>Mitchell</u>, 139 S. Ct. at 2538. They also "may have to preserve evidence at the scene." <u>Id.</u> Such "pressing matters" in addition to time-intensive warrant procedures could delay the BAC draw, and "would require responsible officers to put off applying for a warrant." <u>Id.</u> Waiting to draw blood until a warrant has been secured "would only exacerbate the delay -- and imprecision -- of any subsequent BAC test." <u>Id.</u>

Because modern technology has not eliminated the time it takes to get a warrant, the Supreme Court has cautioned against "forc[ing officers] to choose between prioritizing a warrant

---

Court to explicitly overrule it" (modification in original) (quoting <u>Medeiros</u> v. <u>Vincent</u>, 431 F.3d 25, 36 (1st Cir. 2005))). At the end of the day, as noted, we ask whether a reasonable officer in the circumstances would have believed there was an exigency given the facts known, which include both what did inhibit the warrant application and what could have inhibited the warrant application. <u>Morse</u> v. <u>Cloutier</u>, 869 F.3d 16, 24 (1st Cir. 2017) ("[T]he bottom-line question is whether a reasonable officer would have thought, given the facts known to him, that the situation he encountered presented some meaningful exigency.").

application, to the detriment of critical health and safety needs, and delaying the warrant application, and thus the BAC test, to the detriment of its evidentiary value." Id. at 2538-39. Preventing that "kind of grim dilemma" is precisely "the kind of scenario for which the exigency rule . . . lives to dissolve." Id. at 2538. Notwithstanding that point, remember that the police must "reasonably judge[] that a warrant application would interfere with other pressing needs or duties." Id. at 2539. As Justice Sotomayor (the author of McNeely) commented in dissent in Mitchell, "in many cases, the police will have enough time to address medical needs and still get a warrant." Id. at 2550-51 (Sotomayor, J., dissenting).

What this precedent leaves us with is this: we must decide if the officers responding to Manubolu's crash faced a set of pressing health, safety, and investigative needs that would have so delayed the warrant, especially considering the jurisdiction's application processes, that officers in their shoes reasonably would have believed that they would have "significantly undermin[ed]" the efficacy of the BAC evidence by waiting to do the blood draw. McNeely, 569 U.S. at 152.

B. **Standard of Review and the District Court Ruling**

When reviewing the approval of a motion to suppress, we assess the district court's legal conclusions de novo and factual

findings for clear error.[23]  Rodríguez-Pacheco, 948 F.3d at 6 (quoting Camacho, 661 F.3d at 723-24).  When the motion to suppress regards "evidence seized on the basis of a warrantless search," we give the benefit of the doubt to the defendant and the government must bear its burden of proving the search was constitutionally legitimate.  Id. (quoting United States v. Delgado-Pérez, 867 F.3d 244, 250 (1st Cir. 2017)).

After holding a hearing on the motion to suppress at which Officers Cake and Hardy and Ranger Dominy testified,[24] the district court concluded as a matter of law that there was no exigency.[25]  We spell out the court's reasons and the parties'

---

[23]  Remember, though, that the government has not challenged any of the district court's factual findings.

[24]  At the motion to suppress stage, the government in part contended the warrantless blood draw should not be suppressed because Officer Hardy took it in compliance with then-applicable Maine law and because the state and the federal government had concurrent jurisdiction to prosecute the crime.  In other words, because the blood draw was OK under Maine law and Maine had some sort of jurisdiction, the evidence should be fine in federal court.  The district court disagreed because the government sought to introduce the evidence in a federal prosecution in federal court pursuant to federal rules of evidence.  The draw thus needed to be admissible under federal constitutional law, no matter what the state law was or whether there was concurrent jurisdiction.  Moreover, the national park regulations only permitted state law to govern if the National Park Service regulations did not address the issue (which they clearly did).  See 36 C.F.R. §§ 4.2(a), 4.23(c).  But the government has not pursued that issue on appeal, so we need not worry about it.

[25]  The district court also concluded that the good faith exception (which the government also argued below), which would have allowed the government to avoid suppression even if the officers violated the Fourth Amendment, did not apply because Officer Hardy had no reasonable basis to rely on the then-existing

- 21 -

arguments in a little bit when we explain our application of the Mitchell factors and why we analyze the "totality of the circumstances" differently.  McNeely, 569 U.S. at 145.

## C.  Subjective Intent and the Exigency Analysis

Before we delve into our reasoning, we briefly detour to address the district court's (and Manubolu's) heavy reliance on Ranger Dominy and Officer Hardy's subjective beliefs that BHPD could conduct a warrantless blood draw pursuant to Me. Rev. Stat. tit. 29-A, § 2522.  Indeed, the district court felt the only explanation for why law enforcement did not pursue a warrant was "obvious:  that the officers on the scene did not believe a warrant was necessary due to" Maine law.  Ultimately, though, as the government contends, the officers' intent to rely on the statute does not weigh as heavily as the district court and Manubolu think it does when assessing whether or not exigent circumstance existed.

This is so because regardless of whether Ranger Dominy and Officer Hardy intended to rely on the Maine statute, see Brigham City v. Stuart, 547 U.S. 398, 404-05 (2006) (holding subjective intent of officers does not control exigency analysis), as long as an objectively reasonable officer in their situation would have reasonably believed there to be exigent circumstances,

_____

Maine statute in good faith given controlling Supreme Court precedent.  The government has not appealed that portion of the ruling so we need not detail or consider it.

then the warrant requirement would not have applied, Morse v. Cloutier, 869 F.3d 16, 24 (1st Cir. 2017) (citing Almonte-Báez, 857 F.3d at 32-33).  Although the district court's conclusion rested in part on the officers' subjective intent,[26] the court also weighed, at least to some degree, certain factors faced by the officers, such as pressing health and investigative needs, see Mitchell, 139 S. Ct. at 2537, and the drawn-out warrant procedures, see id. at 2539 (quoting McNeely, 569 U.S. at 155).  The court found them wanting, hinting it considered the late-night crash to be a "fairly ordinary" drunk-driving event.  Therefore, we turn to our analysis of the Mitchell factors and why we disagree with the court's assessment.

### D.  Determining Whether Exigent Circumstances Existed

Recall that the second part of the Mitchell test for exigent circumstances instructs us, given dissipating BAC, to examine whether there were any pressing health needs -- such as transporting a suspect to the hospital or caring for other injured individuals at the scene -- or investigative needs -- such as documenting evidence -- "that would [have] take[n] priority over

---

[26] Even if we did not consider Officer Hardy to be acting as a federal agent, the warrantless blood draw would still have been inadmissible absent exigent circumstances.  See Elkins v. United States, 364 U.S. 206, 208, 223 (1960) (where state officers seize evidence in violation of the Fourth Amendment as incorporated by the Fourteenth Amendment and hand it over to federal officers on a "silver platter," the evidence is excluded in the federal prosecution over timely objections).

a warrant application." 139 S. Ct. at 2537. Recall too, that Mitchell thereafter incorporates McNeely's point that the time it takes to get a warrant on its own factors into the exigent circumstances analysis. See id. at 2539 (quoting McNeely, 569 U.S. at 155). Ranger Dominy testified that he believed there were exigent circumstances based on the fatalities, the nature of the crash, Ranger Dominy's knowledge of when the local bars close, and Manubolu's statements about last consuming alcohol sometime before 1 A.M. The district court disagreed, pointing to, in its assessment, the lack of pressing health needs and the government's responsibility for crafting the lengthy warrant procedures.

### i. Pressing Health Needs

Specifically as to pressing health needs, the district court noted (and Manubolu agrees) that the officers had little to worry about. The EMTs relieved them of emergency rescue responsibilities 16 minutes after Officer Cake first arrived. Moreover, the EMTs treated Manubolu (who had relatively minor injuries consisting of a goose-egg bump and some scrapes on his face). And, as a kicker, the district court pointed out that the officers knew the other three passengers were dead by the time the EMTs got there. In other words, there were no health emergencies which would have made reasonable officers think they did not have time to get a warrant (although Manubolu's injuries did prevent the officers from taking him to the station for a constitutionally

- 24 -

acceptable warrantless breathalyzer test).  See Birchfield, 136 S.

Ct. at 2184.

Despite the government's suggestion that Manubolu's hospitalization alone created an exigency, the district court's analysis was proper, at least so far as it goes.  Cf. State v. Michael, No. 2019-KK-01273, 2020 WL 3867127, at *7-8 (La. July 9, 2020) (per curiam) (finding exigency when a hit-and-run accident caused serious injury to two people, created two separate scenes requiring police investigation, and required the defendant be transported to a hospital for medical attention).  But, since Officer Hardy accompanied Manubolu to the hospital (Manubolu, remember, refused to go to the hospital without Officer Hardy), one officer could no longer help investigate or go back to the station to begin the warrant process.  So, although health emergencies alone here would not necessarily have justified the exigency, the injuries and fatalities still play into the calculus by thinning out the police resources available to investigate the scene.  See Schmerber, 384 U.S. at 770-71.  We move on.

### ii.  Investigative Needs

The district court believed (and Manubolu once more concurs) that Ranger Dominy and the other officers could have prepared a warrant while Manubolu headed off for medical care. Implicit in that finding is the view that the officers should have deprioritized documenting the evidence or questioning Manubolu

- 25 -

before he headed to the hospital so as to prepare a warrant (or, less favorably, that the officers were doing nothing and should have been drafting a warrant affidavit). Manubolu also suggests there were enough officers on scene (a "panoply" in fact, as the district court phrased it) that someone could have pursued the warrant. The government contends Ranger Dominy and the other responding officers did not face such a routine DUI stop, like in McNeely, that would have permitted them time to apply for the warrant before drawing blood at 4:24 A.M. because the officers simply had too much to do given the grisly accident site and three fatalities.

If officers have to "preserve evidence at the scene" of a drunk-driving accident, it weighs in favor of finding an exigency justifying a warrantless blood draw. Mitchell, 139 S. Ct. at 2538; Schmerber, 384 U.S. at 771. The district court seems not to have engaged robustly with the investigative factor, so we must look to the record to see what we can figure out, always remembering that it is the government's burden to prove an exigency supported a warrantless blood draw. Rodríguez-Pacheco, 948 F.3d at 6.

When government resources are diverted to investigating a car accident, courts have tended to find an exigency existed to justify a warrantless blood draw. See, e.g., State v. Fischer, 875 N.W.2d 40, 46-48 (S.D. 2016) (extensive evidence documentation, including finding and identifying severed limbs,

"required immediate attention" sufficient to divert officers from applying for a warrant when the defendant's pressing medical needs necessitated an immediate blood draw). This is particularly true where the responding officers are all busy investigating. See Schmerber, 384 U.S. at 770-71 (sole responding officer faced "emergency" justifying warrantless blood draw considering investigative needs); Fischer, 875 N.W.2d at 46 (all available officers on scene taking part in the investigation contributed to a finding of exigency when pressing medical needs also were present).

As of 3:12 AM when the EMTs arrived, the only three on-duty BHPD officers (Cake, Hardy, and Harrington) were on scene, which, remember, was described as "horrific." Once Ranger Dominy made it at 3:24 A.M., Officer Cake stayed to assist for hours because there was no one else available to help Ranger Dominy with all of the tasks, especially once Officer Hardy went with Manubolu to the hospital (Ranger Dominy even testified to feeling spread thin). Even once the other two available rangers arrived, Ranger Dominy immediately asked them to help investigate. At 4 A.M., Ranger Dominy put Deputy Chief Picard to work assisting the BHPD officers mapping and collecting data about the crash with the reconstruction expert. At 5 A.M., Ranger Belskis arrived and Ranger Dominy at once sent him to the hospital to wait to arrest Manubolu.

Even if the scene was not chaotic, the record indicates the officers were plenty occupied with a variety of tasks. Ranger Dominy and the others had to document evidence, which took long enough that Ranger Dominy did not clear the scene until 7 A.M. The three fatalities did not require the officers to handle any health emergencies, but the deaths forced the officers to coordinate with a medical examiner and to spend time trying to identify the victims. Because of the nature of the crash, the officers had to collect and map evidence before the crash reconstruction expert arrived; they also had to work with the reconstruction expert when he arrived. All the while, Ranger Dominy was aware that the alcohol in Manubolu's blood was dissipating given his estimation that Manubolu had last consumed alcohol around 1 A.M., even if he did not (and could not) testify as to when he estimated the BAC evidence would precisely be destroyed or would become an unreliable barometer of Manubolu's intoxication at the time of the crash. See Mitchell, 139 S. Ct. at 2536 (noting the "biological certainty" that BAC dissipates between .01% and .025% an hour depending on a person's anatomy).[27]

---

[27] Even if Manubolu's last drink was actually right before the crash (meaning there was more time before the blood draw would give imprecise BAC evidence), Ranger Dominy would have had no way to know or to estimate Manubolu's precise BAC at the time of the crash simply by observing him. Without that knowledge, Ranger Dominy could not have known (or estimated) at what time a blood draw would have produced unreliable BAC evidence, so he could not know exactly how long he had to secure a warrant. All Ranger

Much of this investigative work came after the warrantless blood draw at 4:24 A.M., but it is helpful context for understanding why Manubolu's crash was far from the routine type for which it would have been easy for the officers to step away to apply for a warrant. See id. at 2538 (citing McNeely, 569 U.S. at 156). The nature of the crash and the fact that the officers were not sitting around twiddling their thumbs weighs in favor of there being exigent circumstances.[28] See id. at 2537; McNeely, 569 U.S. at 152 (citing Schmerber, 384 U.S. at 770-71); cf. State v. Hay, 946 N.W.2d 190, 197-98 (Wis. Ct. App. 2020) (refusing to find exigent circumstances when the two on-scene officers could have begun the warrant process while waiting for a third officer to arrive, but instead performed no investigative duties while waiting). The Supreme Court has indicated that courts should not force officers into this "grim dilemma" where they have to choose between documenting evidence and applying for a warrant. Mitchell, 139 S. Ct. at 2538. Given the investigative needs, a reasonable officer in the circumstances present here could reasonably have thought, in combination with the dissipating BAC and the realities of the extended warrant process found in this record, that he would

---

Dominy knew was that the BAC was dissipating, and he guessed that it had been dissipating for at least two hours prior to the crash.

[28] As summarized, officers were dealing with identifying the fatalities, mapping data for the crash reconstruction, documenting evidence, dealing with Manubolu at the hospital, and coordinating with the medical examiner.

not get a warrant before the BAC evidence had lost significant evidentiary value.  See McNeely, 569 U.S. at 152.

### iii.  Warrant Process

Notwithstanding the investigative needs resulting from the terrible crash, McNeely teaches us that no exigency can result from the totality of circumstances so long as an officer could have reasonably obtained a warrant without "significantly undermining the efficacy of the [BAC] search."  569 U.S. at 152. In other words, if the officers had time to get a warrant before the dissipation of the BAC even in the face of a tough crash scene with many investigative responsibilities, then they should have gotten a warrant.  Id.

The district court, which Manubolu again follows, fretted (not without good reason) that a late-night or early morning crash like Manubolu's could "always [lead to] exigent circumstances," thus making McNeely "irrelevant" if the government's warrant process "mean[t] that an officer will never (or very rarely) be able to secure a warrant before evidence of intoxication has disappeared or become unreliable."  The court did not want to give a stamp of approval to this warrantless blood draw for fear of creating a per se exigency in all similar circumstances.  The court paid particular attention to the AUSAs' failures to answer their phones (especially the on-duty AUSA specifically charged with picking up the phone!) and to Ranger

Dominy's inability to reach anyone until 4:45 A.M. The third AUSA whom Ranger Dominy called, remember, had taken nearly an hour to connect the ranger to the on-call AUSA.[29] That third AUSA did not immediately help with the warrant process, suggesting to the court that the AUSAs did not "treat[] the need for a warrant as urgent."

Additionally, the court faulted the government for not providing an explanation for why the warrant process would have required Ranger Dominy to return to his office to draft an affidavit before sending it to the AUSA, who would then have drafted a warrant application before sending it back to Ranger Dominy. Only then (finally) would Ranger Dominy have submitted the application to a magistrate judge. The court was particularly perplexed because "the circumstances justifying a blood draw in this case do not appear to be overly complicated." By then citing to the Federal Rules of Evidence permitting telephonic and electronic warrants, as well as to McNeely, which recognized that the availability of those procedures could play into the exigency

---

[29] We pause here quickly to observe a discrepancy in the record -- one that does not alter any of our analysis, but is worth noting nonetheless. According to the incident report, the second and third AUSAs weren't called until 4:13 A.M., and Ranger Dominy received a call from the on-call AUSA about a half hour later, around 4:45 A.M. But the district court reported in its narrative "Order on Motion to Suppress" -- but not in that Order's factual findings -- that the third AUSA "attempted to contact [the on-call] AUSA . . . at 3:53 A.M." However, 3:53 A.M., recall, is the time that Officer Hardy left the scene with Manubolu. That time does not appear in the record in relation to any of the calls to the AUSAs.

calculation, the court concluded that the unnecessarily complicated and lengthy procedure should not weigh in the government's favor because it, "to a significant extent," controlled "the length of that process."

While the record does not provide an exact time for how long the federal warrant process normally would have taken, it took three and a half hours for Ranger Dominy to get the warrant that morning, and it would have taken the BHPD anywhere between three to five hours to navigate its warrant process without electronic or telephonic capabilities. The government, on the other hand, argues that the lengthy, antiquated warrant processes, as well as the unresponsive AUSAs, added to the exigency, especially at the witching hour when the crash occurred.[30]

---

[30] The district court faulted the government for designing a lengthy warrant procedure and for failing even to adhere to its own policies. Manubolu picks this up by implying the government created the exigency through its "failure to adhere to its [own] policies and procedures to obtain a warrant[, which] requires suppression." But Manubolu cites to two district court cases that are inapposite. In the first, the police "deliberately" avoided getting a warrant, even though they had advance knowledge of an impending search and arrest with plenty of time to secure a warrant. See United States v. Khut, 490 F. Supp. 2d 35, 39-40 (D. Mass. 2007); see also United States v. Curzi, 867 F.2d 36, 43 n.6 (1st Cir. 1989) ("Circumstances deliberately created by the police themselves cannot justify a warrantless search."). Even Manubolu does not believe "the AUSA's failure to answer an early-morning phone call" could "be regarded as a 'deliberate' act to create an exigency." The second case on which Manubolu relies suppressed the warrantless blood draw by a national park ranger because the officer did not follow well-established procedures to get a warrant quickly and there were no other factors suggesting that an exigency prevented the officer from doing so. See United States v. Jubor,

McNeely, contrary to the district court's reading, understood that improvements in the warrant process did not mean every jurisdiction would have a seamless application structure, especially for crashes around 3 A.M. 569 U.S. at 155 ("[I]mprovements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest."). Ranger Dominy did not control the AUSAs and he did try to contact them three times in one hour while responding to a triple-fatality car crash. He did not control the warrant application procedures that prevented him from reaching out to the magistrate directly or from drafting a quick warrant application in his cruiser without the approval of an AUSA. By the time Manubolu was heading off to the hospital to get medical treatment, a reasonable officer in Ranger Dominy's shoes might have worried he would not hear from an AUSA within sufficient time to get a warrant and a blood draw before Manubolu's body destroyed the evidence (as an aside, a reasonable officer might have also thought the medical treatment would have further delayed a blood draw or negatively affected the BAC evidence). See Mitchell, 139 S. Ct. at 2537-38. McNeely does not require law enforcement to pursue a warrant until the very last moment before

_____

No. 19-po-631, 2019 WL 5064680, at *6 (D. Md. Oct. 9, 2019). The facts faced by the officers for Manubolu's crash were much different.

they estimate that the BAC will have fully dissipated. 569 U.S. at 164 (cumbersome warrant procedures might justify a warrantless blood draw even for a routine DUI arrest). Nor does it mandate that jurisdictions have updated, faster, and more efficient warrant procedures, even though the opinion (fairly read) strongly suggests that jurisdictions should take advantage of such technological advances if they are able to do so.[31] See id.; State v. Gerety, 399 P.3d 1049, 1052 (Or. Ct. App. 2017) (finding it "troubling" that the jurisdiction had not adopted a telephonic warrant procedure given technological advances, but acknowledging that Supreme Court authority doesn't require adoption of more efficient warrant procedures). We therefore cannot put an exact timeframe on how long is too long for a warrant process to take before it becomes a per se exigency.

While we are sympathetic to the district court's concern about permitting "end-runs" around McNeely, we believe that the existing totality of the circumstances framework adequately

---

[31] We reiterate this lesson from McNeely. Jurisdictions should create streamlined warrant procedures, especially for relatively simple applications like those for a BAC blood draw. 569 U.S. at 154-55. Doing so will protect both the constitutional rights of the defendant and the safety of the public by ensuring prosecutors have the best evidence to prosecute drunk drivers. See Mitchell, 139 S. Ct. at 2531 ("recount[ing] the country's efforts over the years to address the terrible problem of drunk driving" (citing Birchfield, 136 S. Ct. at 2160)). And we encourage district courts to work with law enforcement to establish such systems.

protects against such concerns.  If Ranger Dominy had been able to quickly and easily apply for a warrant "without significantly undermining the efficacy of the search," then we would have required a warrant.  McNeely, 569 U.S. at 152.  That was not the case at the time of Manubolu's crash.  On the "spectrum" of exigencies, this one is closer to the car crash in Schmerber than it is to the routine DUI stop in McNeely.  See Mitchell, 139 S. Ct. at 2533.

### III.  CONCLUSION

Contrary to the district court's concern, we are not creating a per se exigency for late-night DUI stops because our conclusion does not rest solely on the unnecessarily long warrant procedure.  Cf. Commonwealth v. Trahey, 228 A.3d 520, 535-36 (Pa. 2020) (overturning Superior Court's finding of exigency in part because of tension with prohibition of per se exigencies, where a primary factor in the Superior Court's decision was that obtaining a warrant would have taken longer than two hours).  Given the totality of the circumstances, the government has met its burden to show it was reasonable for Ranger Dominy to think exigent circumstances existed when pressing investigative responsibilities took his and other officers' attention, when he could not reach the on-call AUSAs to begin the telephonic warrant process, when the federal and state warrant procedures were protracted, when he reasonably estimated that the evidentiary reliability of

Manubolu's BAC decreased as time wore on, and when health needs and other resource limitations prevented officers from immediately applying for a warrant.  See Mitchell, 139 S. Ct. at 2537.  In other words, we conclude the district court misapplied the law to the facts.  See Rodríguez-Pacheco, 948 F.3d at 6.

We **reverse** and **remand** with instruction to deny the motion to suppress.

**-Dubitante Opinion Follows-**

**KAYATTA**, <u>Circuit Judge</u>, **dubitante**. To decide this case, we need answer two questions: How long would a reasonable officer have thought it would take to get a warrant, once it occurred to the officers at approximately 3:15 a.m. that there was probable cause to get a blood alcohol concentration (BAC) reading?[32] And how much time could pass before the dissipation of alcohol in the blood would significantly undermine the ability to determine BAC at the time of the accident?

The record reveals that getting a state warrant in the early morning hours was known to take three to five hours. The record does not directly reveal how long officers could expect to wait for issuance of a federal warrant. But it does describe in detail the steps involved, and we know that it took over six hours from the time when an AUSA answered Dominy's call until a warrant was issued.[33] So I see no reason to think that, under procedures in place at the time of the accident, a federal warrant could have been obtained more quickly than could a state warrant. And given that we cannot decide the case without some estimate of the

---

[32] Ranger Dominy first called the on-duty AUSA around 3:15 a.m. Also around that time, BHPD Officer Hardy joined Manubolu in the back of the ambulance, where he noticed an odor of alcohol coming from Manubolu.

[33] An AUSA answered Dominy's call at 4:13 a.m. I follow the majority in using 10:30 a.m. as the time the warrant was issued.

- 37 -

expected time required to get a warrant, an estimate of three to five hours seems reasonable on this record.

What is entirely missing from the record is the amount of time that Hardy could wait before BAC dissipation proved problematic. The majority tries to close this evidentiary gap by pointing to the majority opinion in Mitchell v. Wisconsin, which states that "it is 'a biological certainty' that '[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour." 139 S. Ct. 2525, 2536 (2019) (alteration in original) (quoting Missouri v. McNeely, 569 U.S. 141, 169 (2013) (Roberts, C.J., concurring)). Mitchell supports this statement of scientific fact by quoting from Chief Justice Roberts' concurring and dissenting opinion in McNeely. But the Chief Justice made no claim in McNeely that that dissipation rate was a "biological certainty." Rather, his opinion simply states that dissipation itself is a biological certainty. He then cites a forensic handbook for the proposition that "[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour."[34]

---

[34] The opinions in both cases express the rate of dissipation as a percentage (e.g., "0.01%"). This can be confusing because two percentages are implicated: The percentage of alcohol in the blood and the percentage of reduction in that percentage. For clarity, in describing dissipation I refer to the BAC level, such that a drop from a BAC level of 0.02 to 0.01 is a drop of 0.01, not "0.01%." See, e.g., William Ulwelling & Kim Smith, The PEth Blood Test in the Security Environment: What It Is; Why It Is Important; and Interpretive Guidelines, 63 J. Forensic Scis. 1634 (2018), https://doi.org/10.1111/1556-4029.13874 ("BAC[] declines

<u>McNeely</u>, 569 U.S. at 169 (citing Stripp, Forensic and Clinical Issues in Alcohol Analysis, in Forensic Chemistry Handbook 440 (L. Kobilinsky ed. 2012)).

Nor does that figure appear to be generally accepted -- even by the Court.  The majority in <u>McNeely</u> itself uses a different range for the rate of reduction of BAC:  "0.015 percent to 0.02 percent per hour once the alcohol has been fully absorbed," based on trial testimony in that case.  <u>Id.</u> at 152.  The majority also acknowledges that "[m]ore precise calculations of the rate at which alcohol dissipates depend on various individual characteristics . . . and the circumstances in which the alcohol was consumed."  <u>Id.</u> (citing Stripp, Forensic and Clinical Issues in Alcohol Analysis, in Forensic Chemistry Handbook 437—41 (L. Kobilinsky ed. 2012)).[35]

As to the subject of evidentiary impairment, the difference between the <u>McNeely</u> rate and the <u>Mitchell</u> rate is huge.

---

at an average rate between 0.015 (± 0.002) g/100 mL/h blood for men and 0.017 (± 0.003) g/100 mL/h for women.").

[35] Other readily available sources state that the rate of BAC dissipation is 0.015 grams/100 milliliter/hour, Alcohol Metabolism, Bowling Green State Univ., https://www.bgsu.edu/recwell/wellness-connection/alcohol-education/alcohol-metabolism.html (last accessed Aug. 30, 2021), "between .015 percent and .020 percent BAC per hour," Hours to Zero BAC, https://www.selfcounseling.com/help/alcohol/hourstozerobac.html (last accessed Aug. 30, 2021), and "about 0.015 percent an hour," Watch Your BAC (Blood Alcohol Content):  Decide Before You Drive, District of Columbia Metropolitan Police Dep't, https://mpdc.dc.gov/page/watch-your-bac-blood-alcohol-content-decideyou-drive (last accessed Sept. 8, 2021).

Under the former, each passing hour introduces an uncertainty of only 0.005, while under the latter the uncertainty increases by 0.015 each hour, a 300% difference.  Under the former, an original BAC of 0.1 could drop to somewhere between 0.04 and 0.055 after three hours, while under the latter the same original BAC level could drop to anywhere between 0.025 and 0.07 after the same three hours.

All of this suggests to me that a remand would be very useful because it might let doctors or scientists weigh in on the correct dissipation range rather than relying on judges and Google searches.  But given the pronouncement in Mitchell of "a biological certainty," I understand why the majority uses the Mitchell range, so I will do the same.

The potentially bigger problem is that the record also fails to contain any information concerning how quickly BAC dissipation would impair the government's ability to use a blood draw reading to ascertain BAC at a time prior to the blood draw. The majority makes no effort to fill in this gap.  Yet the majority must have some estimate in mind.  After all, if the officers could have waited until 8:30 a.m., for example, and still received the needed evidence from a BAC measurement, then they may have had time to get a warrant, given that Deputy Ranger Belskis was available beginning at approximately 5:00 a.m.

Deciding this case turns on filling this gap in the record. The traditional way to deal with a lack of such significant information is to hold it against the party with the burden of proof. Alternatively, we might remand the case so that expert testimony could shed light on how the passage of time affects the ability to reliably estimate BAC at a time prior to the blood draw. As discussed above, remand would be my preference.

To instead decide this case on the existing record, we must do some math, based on the range of Mitchell dissipation rates accepted by the majority. If the McNeely range (a decrease of 0.01 to 0.025 per hour) is correct, then the efficacy of the BAC had already diminished materially by the time Hardy got Manubolu to the hospital. Its efficacy would have diminished substantially further long before a warrant could have been available. This remains true even if the officers had started trying to get a warrant right away, and even if the sleeping AUSA had been reached on the first call. For example, suppose Manubolu had a BAC of 0.05 at 4:50 a.m. (two hours after the accident).[36] That would tell you that the BAC at the time of the accident was between 0.07 (two hours at a dissipation rate of 0.01 per hour) and 0.10 (two hours at a dissipation rate of 0.025 per hour). That is a

---

[36] Blood alcohol level at the time of the accident, not the earlier time when Manubolu last drank, is the relevant time given the potential charge of causing deaths by operating a vehicle while inebriated.

substantial difference, with one figure below the legal limit for driving and the latter well above the limit. And if one waited until 5:50 a.m., the range of uncertainty would increase substantially.[37]

I suppose it is possible that experts might have a way to reduce the uncertainties created by the wide range in possible dissipation rates. This is another reason why I would likely remand if left to my own devices. But since we are not remanding for such a determination, we should make clear that the outcome of this case really does not turn on most of the facts and discussion contained in the majority opinion. Even if there had been a dozen officers with nothing to do, probable cause to seek a BAC reading was ascertained at 3:15 a.m., so receipt of a warrant before 6:15 a.m. (at the earliest) would have been quite unlikely.

As a practical matter, if a breathalyzer is not available, and a blood draw is the only option, then a warrant will not be required unless it can be obtained much sooner than three hours after the accident. As to how much sooner, we need more of a record to say.

The district court expressed concern that accepting time delays in procuring warrants as an exigency could render McNeely largely a dead letter. But McNeely itself provides that "exigent

---

[37] A reading of 0.025 at 5:50 a.m. could suggest that Manubolu's BAC at 2:50 a.m. was anywhere between 0.055 and 0.1.

circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process." 569 U.S. at 156. As a practical matter, Mitchell already greatly reduces McNeely's force when a breathalyzer is unavailable and warrant procurement takes more than an hour or two. There will nevertheless remain many cases in which breathalyzers are available and/or speedy warrant procurement is available. Mitchell, 139 S. Ct. at 2537 ("[E]ven if the constant dissipation of BAC evidence *alone* does not create an exigency, Schmerber shows that it does when combined with other pressing needs." (emphasis in original) (citations omitted)). In such cases, McNeely will still prohibit blood draws without a warrant. For the reasons described above, though, this is not such a case.

Nor is this to say that the mere fact that BAC levels dissipate per se negates the need for a warrant. Rather, it is to say that if the only choice is between getting a BAC reading without a warrant or losing a usable BAC reading due to three hours' delay in waiting for a warrant, police need not get a warrant, assuming the scientific facts are as Mitchell and our limited record indicate.

I do agree with my colleagues that the district court's sense of pique regarding the diligence of the on-duty AUSAs and the cumbersome nature of the warrant procurement procedures

available at 3:00 a.m. in rural Maine is beside the point. One may well wonder why Maine state and federal courts do not have speedier procedures for obtaining warrants than what is described in the record in this case. But Manubolu cites no authority for applying the exclusionary rule as a means of forcing courts and legislatures to update their warrant procurement procedures. And it would seem that such an approach would involve punishing the public so as to coerce persons other than the police into making policy choices that they likely already have some incentive to make. In any event, without developed argument for such an extended application of the exclusionary rule, I would deem the suggestion waived.

For the foregoing reasons, while I do not dissent and indeed strongly suspect that no warrant was required in this case, I do think the preferable course would be to vacate and remand for further factfinding on the crucial issue of how much time can pass before the efficacy of a BAC reading is undermined.